Filed 8/19/14  P. v. Simmons CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>DENNIS LEE SIMMONS,<br><br>     Defendant and Appellant. | F065631<br><br>(Super. Ct. No. BF138275A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Clara M. Levers and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Dennis Lee Simmons was convicted by jury of premeditated murder (Pen. Code, § 187, subd. (a)) with the personal use of a firearm causing death.[1] (Pen. Code, §§ 12022.53, subd. (d), 12022.5, subd. (a)). The trial court subsequently sentenced defendant to a total term of 50 years to life in prison.

On appeal, defendant contends the trial court erred by: (1) admitting his statement made to the police after he had invoked his right to counsel; (2) excluding evidence of the victim's prior convictions; (3) admitting evidence relating to his possession of certain firearms; and (4) misinstructing the jury regarding the mental state required for second degree implied malice murder. Finding no error, we affirm the judgment.

## FACTS

On August 24, 2011, Eric Onstatt provided Thomas Hill, one of his construction employees, a ride after work. On the way, Hill called defendant and asked if he could stay the night at his home. After the conversation, Hill stated he needed to buy a 12-pack of beer to make up for a previous fight between the two. After buying the beer, Onstatt proceeded to take Hill to defendant's home. When Onstatt arrived, he noticed defendant and Blake standing on the porch with their arms crossed. The two did not appear happy to see Hill. Onstatt asked Hill if he was sure he wanted to be dropped off at the home, but Hill stated he would be all right. Onstatt dropped off Hill at the home sometime between 5:00 and 6:00 p.m.

The following morning at approximately 6:00 or 6:30, Onstatt returned to defendant's home to pick up Hill for work. He honked the horn and waited in his vehicle approximately 10 minutes, but Hill did not come out. Onstatt noticed defendant's red Mazda pickup truck was not in the driveway as it had been the night before. When Hill did not come out, Onstatt left and went to work. Onstatt never saw Hill again.

---

[1]Defendant was tried jointly with Clifton Ray Blake, who was likewise charged with murder. Blake was acquitted by the jury.

Three days later, Hill's body was discovered by a group of campers at Lake Isabella. Hill's hand was protruding from a shallow, water-filled hole in the ground near the lake. There were several rake marks around the hole as well as tire tracks nearby. Additionally, there were partially burnt pieces of wood, which appeared to be fence planks, over the grave site.

Officers subsequently developed information that Hill was last seen at defendant's home. Investigating officers arrived at defendant's home and noticed defendant's truck tires had a tread pattern consistent with the tire tracks left near the grave site, and a shovel and rake were in the bed of defendant's truck. Officers obtained a search warrant and conducted a search of defendant's home.

A search of defendant's home revealed numerous suspected bloodstains on the walls, carpet, and floor of the living room, dining room, and kitchen areas. Additionally, there appeared to be a bloody footprint in the hallway. A criminalist testified the blood patterns indicated at least one "blood letting incident" occurred in the dining room area. Some of the bloodstains were visible to the naked eye while others were discovered through the use of chemical reagents.

Fence planks consistent in appearance with the wood found at the grave site were seized at defendant's home. Subsequent tests and chemical analysis revealed they were consistent with the planks found near the victim's body. Officers found a total of four firearms in the home, including a .22-caliber rifle with apparent bloodstains, along with a spent .22-caliber shell casing and other ammunition. A ballistics expert opined the shell had been fired from the .22 rifle. The gun appeared to be in good working order. The bed of defendant's truck contained a shovel, a rake, a partial denture, a knife with apparent bloodstains on the blade, and lighter fluid. There were apparent bloodstains on the interior handles of the driver's and passenger's doors.

Criminalists obtained swabs of the blood from the house and on other items of evidence that were later compared to DNA samples taken from defendant, Hill, and Blake. The swabs from the carpet stains contained a mixture of DNA with the major

contributor matching Hill. The identity of the minor contributor was inconclusive. Additional bloodstains in the house also matched Hill's DNA. Hill's DNA was found on the rifle, in the bed of defendant's truck, on a shirt recovered from defendant's home, on the blade of the knife found in defendant's truck, and on the dentures found in defendant's truck. This truck was familiar to nearby resident Pamela Shoffstall.

Shoffstall recalled driving by defendant's home on one occasion where she noticed defendant's truck backed into the driveway with defendant and Blake standing near the back of the truck. This was odd because she had always seen the truck parked facing the garage. At the time of trial, Shoffstall could not recall what day she had noticed the truck parked in that manner, although she believed she told the police about it the following day. Sergeant Ian Chandler of the Kern County Sheriff's Office testified he spoke with Shoffstall on the morning of August 28th, and she told him she had seen the truck backed into the driveway on August 24th at approximately 11:30 p.m.

The autopsy on Hill's body was performed by Dr. Kathleen Enstice, a forensic pathologist. At the time of his death, Hill weighed 143 pounds and was six feet three inches tall. Hill had numerous bruises to his arms and legs that occurred sometime in the hours or minutes before his death. She found a total of three gunshot wounds to the victim's body. One bullet entered Hill's body on the right mid back and traveled through both the right and left lungs, coming to rest below his 10th rib. This would have caused bleeding and been fatal on its own within 10 minutes. The next gunshot entered the victim's abdomen below his chest and traveled through the liver and stomach. This also would have been fatal on its own within minutes. Considering the two wounds together, they would have been fatal within three to 10 minutes. Also, the wounds would have incapacitated a person within 10 to 15 seconds of receiving them due to the severity of the damage.

Dr. Enstice found a third gunshot wound that entered on the right side of the victim's jaw, traveled through his throat and came to rest just above the spinal cord. This wound caused extensive damage and fractures to the victim's jaw. During the autopsy,

4.

Dr. Enstice found pieces of the victim's mandible in his stomach and small intestine. Additionally, she found blood and bone fragments in both his stomach and lungs. This indicated the victim swallowed blood and bone as a result of the gunshot and that he aspirated blood and bone into his lungs. The victim could only have done this while still alive. Dr. Enstice opined the victim received the wound to the jaw first because it would have taken a minimum of 40 minutes and up to six hours for the bone to travel to the digestive tract. Furthermore, after receiving the gunshot to the jaw, the victim would have been physically compromised due to the severity of the wound, the pain it would have caused, and the fact the bone fragments were partially blocking his airways.

A toxicology test revealed the victim had a blood-alcohol level of 0.114 and that he had methamphetamine in his blood. Methamphetamine can cause violent and irrational behavior.

Sergeant Avery Simpson of the Kern County Sheriff's Office interviewed defendant on August 28th. The interview, audio and video recorded, was played for the jury. During the interview, defendant expressed surprise when he was told the victim was dead, and he denied any involvement in the death. Defendant admitted Hill came to his home on August 24th, but left on foot and never returned after calling someone. Simpson confronted defendant with the presence of the tools in his truck, the similar tire tracks, and the fence planks at the grave site that matched defendant's fence. Despite the evidence, defendant continued to deny knowing anything regarding the victim's death. Using a ruse, Simpson informed defendant he had a video of him burying the victim's body and claimed defendant's tires, tools, and fence planks had been conclusively matched to the evidence left at the gravesite. Despite this information, defendant continued to deny any involvement in Hill's death and stated he could not explain the evidence against him. At one point in the interview, Simpson told defendant either "something bad happened that I … don't understand or you guys are just cold blooded murderers." In response defendant denied killing Hill and never indicated he acted in self-defense.

5.

*Defense Case*

Defendant testified he killed the victim in self-defense. He explained he had met Hill in approximately April of 2011 when he first moved into his home. Defendant allowed Hill to stay with him occasionally because Hill had no place to stay, but he ended the arrangement when he discovered Hill was using defendant's insulin needles to inject methamphetamine. According to defendant, Hill was a methamphetamine user and would often ask for money. Additionally, the two got into a few physical fights. Hill would sometimes just hit defendant as he walked by, but if he had been drinking, he would hit defendant hard, and defendant would hit him back. Defendant recounted an incident that occurred about a week prior to the victim's death where Hill attacked him. The two were arguing over money and defendant told Hill to leave. When defendant turned around, Hill threw defendant against the patio, pushed him over the railing onto the ground below, then began punching and kicking him.

Regarding the night in question, defendant acknowledged Hill called him and asked to come over. Defendant initially told him no, but Hill persisted and defendant allowed Hill to visit. Onstatt dropped off Hill at defendant's home. Hill had brought a 12-pack of beer with him. Approximately 20 minutes later, Hill left. He returned a short time later, but was angry and demanding money. Hill confronted defendant in the kitchen area of the home where defendant's loaded .22 rifle had been left leaning against the wall. Defendant had planned to clean it. Hill continued "rambling about something" when defendant walked over toward the television set and was about to change the channel when Hill picked up the rifle. Hill aimed the gun at defendant and said, "'I told you. You can't talk to me like that. You son of a bitch.'" Defendant told Hill to put the gun down, explaining it was loaded. Hill pulled the trigger.

The gun did not fire as the safety had been engaged. Defendant then grabbed the gun by the barrel and the two engaged in a violent struggle. When defendant managed to pull the gun toward himself, the victim leaned over and grabbed the stock and the gun went off. The bullet struck Hill in the stomach area. The two men went to the ground

6.

but Hill continued to fight for the gun. While on the ground the gun went off a second time, this time hitting Hill in the side. Hill finally released the gun.

Hill leaned on a chair and began swearing at defendant. He had blood coming out of his mouth, and defendant told Hill to sit down. At this point defendant was holding the gun and demanding that Hill sit down. Hill said, "'I'll kill you you son of a bitch'" and started running toward defendant when defendant fired a round at Hill, hitting him in the jaw. Hill took a few steps and fell face first to the floor. He was bleeding and groaning. Defendant told him to stay down, but Hill continued to try to get up. Hill fell backwards and then "scooted" around the kitchen area while making gurgling noises. Then his "eyes kind of fixed and he's stuck." At that point, defendant could tell Hill was dead.

Defendant estimated the whole incident lasted approximately five minutes although it felt much longer. After realizing Hill was dead, defendant panicked and began drinking whiskey and smoking. The thought of Hill confronting him with the rifle and pulling the trigger made him angry. He believed the only reason he was alive was because the safety to the rifle had been engaged.

Defendant was angry that Hill was bleeding on his floor, so he got a tarp and wrapped Hill's body inside. After rolling Hill's body in the tarp, defendant had another drink and a cigarette and thought about what to do, deciding he had to move the body. Using a rope, he tied up the body in the tarp and dragged it outside. He loaded the body into a wheelbarrow and then transferred the body into his truck.

Defendant did not call the police initially, and once he started moving Hill's body he felt he could not call the authorities because the situation would look bad. Defendant decided to take Hill out to the lake and bury him. He chose Hanning Flat as the burial site. Hill had gone fishing with defendant there before and told him he "'could just stay [t]here forever.'" Once out by the lake, defendant dug a hole, put the body inside, filled it in, raked the area, and built a fire over the gravesite so it would look like a fire pit.

Defendant happened to have all of the tools necessary in his truck as he kept them there for fishing and clamming.

When defendant returned home, Blake was there. Blake had been at the house when Hill arrived, but left to walk the dog before Hill left and did not return until after defendant had left to bury the body. Defendant lied to the police about what had happened when he was interviewed because a "lie becomes a lie becomes a lie." Although the officer had given him a chance to explain and told defendant the evidence looked like he was a cold-blooded killer, defendant continued to deny his involvement because he was "committed" to his lie.

Defendant was five feet nine inches tall and weighed approximately 220 pounds when Hill was killed. He had diabetes and a bad back. At the time of his arrest, defendant had bruising to his chest and stomach and an abrasion on his back.

## DISCUSSION

**I.      Defendant's Motion to Suppress His Statements Was Properly Denied**

During trial, the court held an Evidence Code[2] section 402 hearing to determine the admissibility of defendant's statement to the police. At that hearing, Simpson testified that prior to interviewing defendant he provided him with his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Defendant waived these rights. He spoke to the officer in an interview that was audio and video recorded. A copy of the recording was played for the trial court during the hearing.

On the recording, defendant made several references to an attorney. Defendant made the first reference to an attorney partway through the interview when the detective was questioning him about the last time he would have shot his gun. Defendant asked, "Do I need an attorney?" Simpson began his reply with, "Well that's—" when defendant interrupted and said "Look I mean you're acting like I … killed this guy. I wouldn't kill

---

[2]All further references are to the Evidence Code unless otherwise indicated.

8.

nobody." The two continued talking about what defendant might know about the victim's death.

A short time later, Simpson confronted defendant with the evidence against him and that his response that he did not know anything about the victim's murder appeared implausible. At one point, Simpson said, "Hold on I need to call my boss right now cause I got [to] make a decision do … I arrest you for murder or what do I do. I got to call my boss and he's going to say well what did he say." During a short exchange between defendant and Simpson, defendant continued to deny any knowledge of the victim's murder and stated he could not answer the detective's questions because he did not know the answers. Then the following exchange took place:

> "DETECTIVE: Well do you … realize what's going to happen if you cant [*sic*] give me the answers to what you don't know.
>
> "[DEFENDANT]: I apparently I do I need an attorney?
>
> "DETECTIVE: That's that's up to you but—
>
> "[DEFENDANT]: Alright.
>
> "DETECTIVE: —let me step out and call my boss and I'll be back with you in a minute. Just hang tight.
>
> "[DEFENDANT]: Okay."

Simpson stepped out of the room for a few minutes and when he returned, he asked defendant, "You change your mind?" Defendant replied "No," and then stated, "I don't have anything that's changed I don't if I had to I can't fill in the blanks for what I don't know." The two continued to discuss the case when apparently defendant made a third statement in reference to an attorney.[3]

---

[3]The parties provided this court with the exhibit of the transcript and the redacted video played for the jury. As the trial court ruled the third reference to an attorney was an invocation of his right to counsel, that request and everything following it were redacted. The third reference to an attorney consisted of the statement, "'Well, I need an attorney. I need to talk to him, then.'"

After hearing the testimony and watching the recording, the trial court ruled defendant's first two statements regarding an attorney were not invocations of the right to counsel. Specifically, the trial court explained defendant's first reference to an attorney consisted of the question "do I need an attorney?" which was not a clear invocation of the right to counsel. The court also concluded the second reference to an attorney consisted of the same question, specifically, "I apparently I—do I need an attorney?" When viewed this way, defendant simply reiterated the same question as before, which did not amount to an invocation of his right to counsel. As such, the motion to suppress defendant's statements was denied. On appeal, defendant reiterates his argument, claiming the trial court erred in admitting his statements to Simpson. We find no error.

In reviewing a trial court's ruling in a case such as this, we "'"'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]"'"' (*People v. Crittenden* (1994) 9 Cal.4th 83, 128, quoting *People v. Johnson* (1993) 6 Cal.4th 1, 25, overruled on other grounds in *People v. Rogers* (2006) 39 Cal.4th 826, 879; see *People v. Boyer* (1989) 48 Cal.3d 247, 263, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) Where the facts are undisputed, we independently determine whether the defendant unambiguously invoked the right to counsel. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

"In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must unambiguously' assert his right to silence or counsel." (*People v. Stitely* (2005) 35 Cal.4th 514, 535, quoting *Davis v. United States* (1994) 512 U.S. 452, 459, italics omitted.) The request must be sufficiently clear "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis v. United States*, *supra*, at p. 459.) "It is not enough for a reasonable police officer to understand that the suspect

10.

*might* be invoking his rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda* … either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely*, *supra*, at p. 535.) Once a defendant makes a clear and unambiguous request for counsel, all questioning must cease until an attorney is present. (*Davis v. United States*, *supra*, at p. 462; *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485.)

There is no dispute defendant was properly advised of his *Miranda* rights and chose to speak with the officer. Defendant argues, however, the record demonstrates he unequivocally invoked his right to counsel when he asked the question "do I need an attorney?" We disagree. By its nature, a question is not a statement. The record amply supports the trial court's finding that defendant's reference to an attorney was in the form of a question. Our independent review of the interview also supports this conclusion. Defendant asked the officer, "do I need an attorney?" This question, asked by defendant during the interview, falls far short of the necessary "unequivocal" and "unambiguous" request for counsel. Such a question would not lead a reasonable police officer to understand defendant was requesting an attorney.

We acknowledge a nearly identical expression has been held sufficient to invoke the right to counsel. In *People v. Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 735, the court noted the statements "Do you think we need an attorney" or "I guess we need a lawyer" were sufficient to constitute an invocation of the right to counsel. However, *Zolnay* was decided prior to the passage of Proposition 8, which became effective in 1982. The law now requires us to apply federal standards to a claim that a statement was elicited in violation of *Miranda*. Prior to 1994, California courts held "a request for counsel need not be unequivocal in order to preclude questioning by the police." (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 129.) Subsequently, the United States Supreme Court in *Davis v. United States*, *supra*, 512 U.S. 452 held a suspect is required to make an *unequivocal* request for a lawyer to invoke the right to counsel. "*Davis* now provides the standard by which we assess whether a defendant's reference to counsel constituted an

11.

unambiguous and unequivocal invocation of the right to counsel." (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)  Thus *Davis* has called the holding in *Zolnay* into question.  (See *People v. Crittenden*, *supra*, at pp. 129-131; see also *People v. Simpson* (1998) 65 Cal.App.4th 854, 860, fn. 2.)

Indeed, several federal cases have held the question asked by defendant does not amount to an unequivocal request for counsel.  (See, e.g., *Burket v. Angelone* (4th Cir. 2000) 208 F.3d 172, 197–198 ["'I think I need a lawyer'" was equivocal]; *Diaz v. Senkowski* (2d Cir. 1996) 76 F.3d 61, 63–65 ["'Do you think I need a lawyer?'" was equivocal]; *U.S. v. Ogbuehi* (9th Cir. 1994) 18 F.3d 807, 813-814 ["'Do I need a lawyer' or 'Do you think I need a lawyer' does not rise to the level of even an equivocal request for an attorney"].)

Accordingly, we conclude defendant's initial statement "do I need an attorney" did not rise to an unequivocal and unambiguous request for counsel.  In context, defendant was simply asking Simpson a question relative to the officer's insinuation defendant was responsible for the victim's death.  Simpson began to answer defendant's inquiry when defendant interrupted and continued making statements denying his involvement in the victim's death.  No reasonable police officer could have concluded defendant's question was a request for counsel.  (See, e.g., *Davis v. United States*, *supra* 512 U.S. at pp. 461-462 [defendant's statement "'Maybe I should talk to a lawyer'" held equivocal]; *People v. Stitely*, *supra*, 35 Cal.4th at pp. 534-536 [defendant's statement "'I think it's about time for me to stop talking'" was not sufficiently unequivocal to invoke right to silence]; *People v. Suff* (2014) 58 Cal.4th 1013, 1068-1069 [defendant's statement "'if I'm being charged with this I think I need a lawyer'" held equivocal and conditional and therefore insufficient to invoke right to silence]; *People v. Gonzalez*, *supra*, 34 Cal.4th at pp. 1119, 1126 [defendant's statement "'if for anything you guys are going to charge me I want to talk to a public defender too'" was conditional "on its face" and therefore was "at best, ambiguous and equivocal"]; *People v. Roquemore* (2005) 131 Cal.App.4th 11, 25 ["'can I call a lawyer or my mom to talk to you?'" held equivocal].

Likewise, defendant's subsequent statement, "I apparently I do I need an attorney" was equally ambiguous. We note the statement as it appeared in the transcript could be read several different ways. Indeed, defendant would have us read this as a declaration: "I apparently, I do, I need an attorney." However, the trial court made a finding regarding this statement, that defendant actually stated, "'I apparently I—do I need an attorney?" Under this interpretation, defendant began by making the statement "I apparently I" and then changed course and asked a question, "do I need an attorney?" This finding was amply supported by the record, specifically the recorded interview we have independently reviewed. It is clear from this recording that defendant began making a statement, "I apparently I," but then stopped and asked the question, "do I need an attorney?" Defendant simply appeared to be reiterating the question he asked earlier. Thus, for the same reasons, we find it was not an unequivocal assertion of the right to counsel, and defendant's statement was properly admitted into evidence.

## II. Defendant Forfeited His Claim Regarding Admission of the Victim's Prior Offenses

Defendant contends the trial court erred by excluding evidence of the victim's prior convictions for possession of methamphetamine for sale and making a criminal threat. Because defendant never sought to admit any of the victim's prior convictions on the grounds urged on appeal, we find the issue forfeited.

Prior to trial, the court addressed the parties' in limine motions. Neither defendant nor the prosecutor presented a written motion relating to the admissibility of the victim's prior offenses. When the trial court addressed defendant's in limine motions, defendant never sought to admit any of the victim's prior convictions. While addressing the prosecutor's motions in limine, the prosecutor made an oral motion "as it relates to priors of the victim and [two] witnesses." Initially, the court addressed the prior convictions on moral turpitude of the witnesses. Defendant's counsel argued the convictions related to "moral turpitude goes to the credibility of … a witness unless the Court determines it's remote in time and has very little probative value." The court conducted an analysis on

13.

the prior convictions consistent with *People v. Castro* (1985) 38 Cal.3d 301, 316, and section 352 and excluded the priors.

Shortly thereafter, the prosecutor noted "the last issue, as far as witnesses, it's not really a witness. It's the victim in the case. I did provide convictions of moral turpitude. I would like a ruling in advance as to which particular convictions counsel has intended to present." The court clarified "your victim has crimes of moral turpitude?" to which the prosecutor replied, "Yes." The court inquired as to the nature of the prior convictions, and defendant's attorney listed the prior offenses for the court, including prior convictions for: unauthorized possession of access card information pursuant to Penal Code section 484e, subdivision (d) from 2007; misdemeanor hit and run (Veh. Code, § 20001) from 2000; misdemeanor possession of stolen property (Pen. Code, § 496) from 2007; criminal threats (Pen. Code, § 422) and auto theft (Veh. Code, § 10851) from 1994; and possession of methamphetamine with the intent to sell (Health & Saf. Code, § 11378) from 1990.

The court asked defendant's attorney which convictions he sought to admit "and why." He responded:

> "I think in regards to this, Your Honor, the only thing may be somewhat relevant is the [possession with the intent to sell] and the criminal threats one from 1990, one from 1994 that I would be seeking to address. But I'm not even sure I'll be going into that."

The prosecutor responded that the offenses were "old" and the crimes were "crimes of moral turpitude, but as far as I can tell, other than the [criminal threats], which I think he initially got probation on, you know, there were no crimes of violence. At best, he was a thief." The court considered the victim's criminal history and noted the convictions for the possession for sales charge and the criminal threats charge were

> "22 years old and 17 years old or 18 years old respectively. Just the analysis we just accomplished a little while ago, again, they are so remote I just don't see the probative value of them here at this time.
>
> "2000 we have a [Vehicle Code section] 20001 [hit and run] misdemeanor. But in 2007, which is within the last five years, we do have

14.

a felony of moral turpitude, that [Penal Code section] 484 … access card or bad check or something, that can be used.  [¶] The 2007 [Penal Code section] 484 is in play.  The rest of it is not.

"However, if for whatever reason during the course of the testimony the '90 or '94 conviction becomes relevant, I'll certainly be all ears to that."

The issue of the prior convictions was never again raised by defense counsel during the trial.  Defendant now argues the trial court applied the wrong standard in addressing the victim's prior convictions.  He argues the court applied an analysis pursuant to *People v. Castro* regarding the prior convictions when the defense sought to introduce the priors as "other crimes evidence offered to show propensity under section 1101."  The People counter, correctly, that the admission of propensity to demonstrate a victim acted in conformity with a character trait is governed by section 1103, not section 1101.  The People assert defendant never raised this theory in the trial court, thus the issue has been forfeited on appeal.  Defendant replies:

"The claim was not forfeited.  The defense offered relevant evidence of prior criminal acts by the victim, and the prosecutor objected.  The trial court chose to exclude the evidence under the *Castro* criteria.  The defense, having offered the evidence, was under no obligation to correct the trial court's error."

We agree with the People that defendant's contention is not cognizable on appeal.

Pursuant to section 354, subdivision (a), a judgment shall not be reversed due to "the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that:  [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means."  "This is in accord with 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court *on the ground sought to be urged on appeal.*'  (*People v. Rogers* (1978) 21 Cal.3d 542, 548, italics added.)"  (*People v. Hill* (1992) 3 Cal.4th 959, 989, disapproved on another ground in *Price v. Superior*

15.

*Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  In *Hill*, the defendant forfeited an argument that certain hearsay was admissible to show his state of mind because he did not argue that theory to the trial court.  (*Hill*, at p. 989.)

Likewise, in *People v. Morrison* (2004) 34 Cal.4th 698, the Supreme Court found failure to advance a theory in the trial court forfeited the issue on appeal.  There, the defense sought to introduce evidence of a "possible drug connection" regarding the victims' brother.  The prosecutor opposed the motion, noting there was only an allegation of possible drug trafficking.  The prosecutor contended the evidence was irrelevant as to motive and it was without any foundation.  The trial court agreed and excluded the evidence "'unless [counsel] can convince me otherwise at a later time with more particularity.'"  (*Id*. at p. 712.)  On appeal, the defendant argued the trial court's exclusion of the evidence was erroneous and provided specific theories regarding its admissibility along with a detailed rendition of the evidence that was excluded.  The California Supreme Court explained the "record plainly shows that defendant's offer of proof prior the guilt phase did not advance any of the theories of relevance he presents now."  Consequently, the issue was forfeited.  (*Ibid*.)

Similarly here, defendant never advanced any theory upon which the victim's prior convictions would be admissible to prove motive under section 1101, subdivision (b) or how the prior convictions would have demonstrated a propensity for violence, thus bolstering his claim of self-defense under section 1103.  He focused solely on two priors—the possession for sale of methamphetamine and the criminal threats—noting the two may be "somewhat relevant" but never explained in what manner even though the court had inquired as to why they would be relevant.  Defendant made no argument nor advanced any theory that the priors were admissible as other acts evidence under section 1101, subdivision (b) or as propensity evidence under section 1103.  Defense counsel never argued the priors were relevant to the issue of self-defense.  As these theories of admissibility were not raised in the trial, despite the court's invitation to provide any additional theories of relevance, defendant has forfeited the issue. (See, e.g., *People v.*

*Smith* (2003) 30 Cal.4th 581, 629-630 [issue not cognizable on appeal where defendant did not advance same theory of admissibility in trial court]; *People v. Loker* (2008) 44 Cal.4th 691, 729 [same]; *People v. Smithey* (1999) 20 Cal.4th 936, 995 [failure to raise issue that admission of evidence was constitutionally compelled forfeited issue on appeal]; *People v. Valdez* (2004) 32 Cal.4th 73, 106-109 [defendant's presentation of new theory of admissibility of evidence, which also contradicted claim in trial court, could not be presented for the first time on appeal].)

**III.    Evidence Relating to Other Firearms Found in Defendant's Home May Not Be Questioned on Appeal Because No Objection Was Made at Trial**

During the defense case, the prosecutor cross-examined defendant regarding firearms found in his home as follows:

"[PROSECUTOR]  Q.  In reviewing the firearms that were at your house, I noticed that you had a black powder firearm?

"[DEFENDANT]  A.  Right.

"Q.  Tell us a little bit about what black powder is?

"[DEFENSE COUNSEL]:  Objection.  Relevance.

"THE COURT:  Sustained.

"[PROSECUTOR]:  May I have a sidebar, Your Honor.

"THE COURT:  Yes.  [¶] … [¶]

"(A discussion was held at sidebar which was not reported.)

"THE COURT:  Let the record reflect I did speak with counsel at sidebar.  [¶] … [¶]

"[PROSECUTOR]  Q.  In addition to the black powder firearm, what other firearms do you have at the house?

"[DEFENDANT]  A.  There was a 4570 rifle.

"Q.  What else do you have?

"A.  And I had a pellet gun.

"Q.  And the Marlin .22?

17.

"A. Yeah, and the Marlin .22."

Defendant contends the trial court erred in allowing evidence of other guns found in the home. Where there is no dispute as to which firearm was used in the commission of the offense, it is improper to admit evidence of other firearms because the evidence tends to demonstrate the defendant has a propensity to possess such weapons. (*People v. Riser* (1956) 47 Cal.2d 566, 577, disapproved on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98 and *People v. Morse* (1964) 60 Cal.2d 631, 652, fn. 17.) While defendant properly articulates this principle, it is apparent from the record that he never objected to the admission of this evidence, on this or any other basis, in the trial court.

Failure to object to the admission of evidence in the trial court forfeits the issue on review. (§ 353; *People v. Pearson* (2013) 56 Cal.4th 393, 438-439; *People v. Partida* (2005) 37 Cal.4th 428, 433-434.) As the California Supreme Court has explained:

> "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal."' [Citation.] 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.]

> "Thus, the requirement of a specific objection serves important purposes. But, to further these purposes, the requirement must be interpreted reasonably, not formalistically. '[S]ection 353 does not exalt form over substance.' [Citation.] The statute does not require any particular form of objection. Rather, 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal

18.

that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida*, *supra*, 37 Cal.4th at pp. 434-435.)

Here there was never any objection to the admission of evidence relating to the other firearms found in the home. Referencing the objection noted in the above exchange, defendant argues he did in fact object to the evidence. He is mistaken. The question defendant objected to asked defendant to explain "what black powder is." Defendant objected to this question on relevance grounds and that objection was *sustained*. There was no further discussion about black powder. After a brief sidebar, the prosecutor asked defendant about the guns he possessed at the time. Defendant answered these questions without objection. From this record it is apparent there was never an objection to the admission of evidence relating to other firearms.

This conclusion is further supported by the fact evidence of the other firearms was previously admitted in the People's case-in-chief. The criminalist testified a search of defendant's home revealed four firearms. Additionally, in the recorded interview with Simpson, defendant discussed the other firearms he owned. There was never any objection to the admission of this evidence. Thus, defendant may not now argue the evidence was improperly admitted. (*People v. Partida*, *supra*, 37 Cal.4th at pp. 434-435.)

For the first time in his reply brief, defendant suggests the failure to object to the evidence constituted ineffective assistance of counsel. We decline to reach the argument. As our Supreme Court explained in *People v. Duff* (2014) 58 Cal.4th 527, 550, at footnote 9, it "is rarely appropriate to resolve an ineffective assistance claim on direct appeal (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267); we certainly will not do so where, as here, the claim is omitted from the opening brief and thus waived (*People v. Barragan* (2004) 32 Cal.4th 236, 254, fn. 5; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.)" Furthermore, "'[w]here a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without

19.

foundation and requires no discussion.'" (*People v. Dougherty* (1982) 138 Cal.App.3d 278, 282; see *People v. Hardy* (1992) 2 Cal.4th 86, 150.) Other than a passing reference, defendant provides no argument for his ineffective assistance of counsel claim. Accordingly, we decline to address it.

**IV.  The Jury Was Properly Instructed on Implied Malice Murder**

Defendant argues the trial court erred by instructing the jury all forms of murder, including implied malice second degree murder, required a specific intent. Such an instruction, he argues, effectively removed the option of second degree implied malice murder, a lesser included offense, to the charged crime. We disagree because defendant's premise is not supported.

The jury was instructed the charged crimes required a union of act and intent. Specifically, the jury was instructed as follows:

> "The crimes and/or allegations charged in Count 1 require the proof of the union or joint operation of act and wrongful intent. The following crimes and allegations require general criminal intent, that is, the firearm enhancement in Count 1.

> "For you to find a person guilty of this crime and to find the allegation true, that person must not only commit the prohibited act or fail to do the required act but must do so with a wrongful intent. The person acts with wrongful intent when he or she intentionally does a prohibited act or fails to do a required act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction of that crime or allegation.

> "The following crime and allegation requires specific intent *or mental state*. Murder and [its] … lesser included offense. For you to find the person guilty of these crimes or to find the allegations true, that person must not only intentionally commit the prohibited act or intentionally fail to do the required act but must do so with the specific intent *or mental state*. The specific intent *or mental state* required are explained in the instruction for that crime and allegation." (Italics added.)

The jury was further instructed regarding the crime of murder:

> "The defendant is charged in Count 1 with murder in violation of Penal Code Section 187. To prove that the defendant is guilty of this crime, the People must prove that one, the defendant committed an act that caused

20.

the death of another person; and, two, when the defendant acted, he had a state of mind called malice aforethought; and, three, he killed without lawful excuse or justification.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. The defendant acted with express malice if he unlawfully intended to kill.

"The defendant acted with implied malice if he intentionally committed an act; number two, the natural and probable consequences of the act were dangerous to human life; number three, at the time he acted, he knew his act was dangerous to human life; and number four, he deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or any passage of any particular period of time. [¶] … [¶]

"If you decide the defendant committed murder, you must then decide whether it is murder of the first or second degree."

In addition, the jury was fully instructed regarding complete and incomplete self-defense, heat of passion, provocation, and voluntary intoxication, and it was provided with all lesser included offenses to first degree murder, including second degree murder and voluntary manslaughter.

Defendant argues the instruction given to the jury informed it that all theories of murder required specific intent to kill. (*People v. Rogers*, *supra*, 39 Cal.4th 826.) He notes, however, a person could be found guilty of second degree murder on an implied malice theory, which does not require the specific intent to kill. He contends the instructions effectively prevented the jury from considering this lesser included offense to the charged crime. We disagree.

*People v. Rogers* is inapposite. There the trial court gave a concurrence instruction informing the jury murder was a specific intent crime. It further instructed "'the crime of murder requires the specific intent to unlawfully kill a human being.'" (*People v. Rogers*, *supra*, 39 Cal.4th at pp. 872-873, italics omitted.) This was error as

21.

"implied malice second degree murder, a form of murder, does not require the specific intent to kill." (*Id.* at p. 873.)

Unlike *People v. Rogers*, the jury here was not instructed all types of murder required the intent to kill. Nor did the trial court instruct the jury all forms of murder were specific intent crimes. Rather, the court explained the crime of murder could require either a specific intent or *mental state*. Additionally, instead of providing the intent or mental state required within the concurrence instruction itself, the court directed the jury to the instructions defining the crimes to determine what intent or mental state was required. The trial court later accurately explained murder could be based upon either express or implied malice and provided the appropriate definitions of those terms.

Defendant and the People disagree as to whether second degree implied malice murder is properly labeled a general or specific intent crime. Our high court has noted the crime does not fall neatly into the category of either specific intent or general intent. (*People v. Whitfield* (1994) 7 Cal.4th 437, 450, superseded by statute as stated in *People v. Mendoza* (1998) 18 Cal.4th 1114, 1126.) This is because although the crime does not require a specific intent to kill, it does require the intent to do an act likely to cause death and with a conscious disregard of that risk. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 111-112.) Thus, under an implied malice theory, the malice is implied from defendant's intent to do an act, knowing his actions are dangerous to human life. (*People v. Swain* (1996) 12 Cal.4th 593, 601-603.) Reviewing the instructions as a whole, we conclude the jury was properly instructed regarding the elements necessary for second degree implied malice murder. (*People v. Wilson* (1992) 3 Cal.4th 926, 943.)

Regardless of how the trial court's instructions denominated the intent required for second degree implied malice murder, the jury was properly instructed as to the elements of that count. Furthermore, nothing in the concurrence instruction could be reasonably construed as requiring any additional elements to second degree implied malice murder. The instruction simply informed the jury the charge required defendant to have harbored either a specific intent or a mental state when he committed the crime. It then referred

22.

the jury to the instruction defining the crime for that requirement. The jury was told second degree implied malice required defendant do an act dangerous to life, knowing of that danger and consciously disregarding the risk. This is a proper statement of law. Nothing in the concurrence instruction added an element of specific intent to kill, as did the court's instruction in *Rogers*. Thus, we find no error.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
POOCHIGIAN, J.

23.