[No. G020449. Fourth Dist., Div. Three. July 24, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ANDREW SIMPSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

COUNSEL

Arthur H. Weed for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Janelle Marie Boustany, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BEDSWORTH, J.**—A jury found Richard Andrew Simpson guilty of possessing more than 28.5 grams of marijuana and illegal possession of a firearm. A prior conviction allegation under Penal Code section 667.5, subdivision (b) was found true by the court.

Prior to trial, an Evidence Code section 402 motion was heard to determine the admissibility under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] of statements Simpson made at a police command post immediately preceding the execution of a search warrant at his home. The trial court found Simpson's statement revealing the location of an automatic weapon at his residence admissible under *New York* v. *Quarles* (1984) 467 U.S. 649 [104 S.Ct. 2626, 81 L.Ed.2d 550], which articulated a "public safety" exception to the *Miranda* rule. (*Id.* at pp. 655-657 [104 S.Ct. at pp. 2631-2632].) Simpson appeals from that determination and also contends the trial court improperly imposed a sentence for his prior conviction under Penal Code section 667.5, subdivision (b), because the same conviction was used to prove he was a convicted felon in connection with the gun possession charge—a prohibited dual use of facts.

In the published portion of our opinion, we hold that when police officers prepare to execute a search warrant upon premises occupied by a known drug trafficker, having probable cause to believe substantial quantities of illegal drugs will be found but not knowing who else might be present on the property, an objectively reasonable basis exists for permitting them to question the suspect about the presence of weapons and other potential dangers they might encounter without preceding such questions with the warnings ordinarily required by *Miranda*. In the unpublished part of our opinion, we find the sentence imposed was legally authorized and not based upon any impermissible dual use of facts.

FACTS

Veteran Culver City Police Officer Mike Conzachi received information which eventually led a magistrate to issue him warrants to search four homes, including a residence occupied by Richard Simpson in Orange Park Acres. Conzachi believed Simpson and others named in the warrants were in possession of up to 100 kilos of cocaine and about a half ton of marijuana. He also knew Simpson had several prior arrests, a state conviction for selling cocaine, and a federal conviction involving the importation of approximately 17,000 pounds of marijuana.

Warrant in hand, Conzachi and members of his task force established a command post at Rancho Santiago College and began surveillance of Simpson's house. Around 10:15 a.m., Mrs. Simpson left the residence and drove her child to a nearby elementary school. Before she could return home, she was stopped by an Orange County sheriff's deputy and met by Conzachi, who advised her he had a search warrant for her residence and "was just going to detain her temporarily until [he] was ready to serve" it. She was then taken to the command post at the college to wait.

While Mrs. Simpson cooled her heels, a sheriff's deputy telephoned Simpson and informed him his wife had been in a traffic accident. He told Simpson she was uninjured but needed him to meet her and help make arrangements about the car. The ruse worked: Simpson left the house and was allowed to drive about five blocks before being pulled over. Officer Conzachi "just told Mr. Simpson who I was, the reason for his detention, and that I had a . . . warrant to search his residence because I suspected . . . he was involved in narcotic trafficking." Simpson was then placed in handcuffs and taken to the college to join his wife pending execution of the warrant.

When Conzachi and Simpson reached the college, within five minutes of the car stop, Conzachi asked "[i]f there were any guns or weapons on the

property." Simpson replied "that he did have a gun, that it was in his bedroom, [the] upstairs master bedroom, that it was under a mattress but he did·not know whether . . . it was loaded." He also specifically identified the weapon as a .380-caliber automatic. In response to further inquiry, Simpson admitted the gun was his and told Conzachi a youngster and the child's nanny were still on the premises, along with 14 Rottweilers—most of which were vicious attack dogs he expected would not welcome officers arriving to search the property.

After this brief conversation, Orange County Animal Control was sent to the scene to secure the Rottweilers, and a search·was conducted without incident. While the officers did not find the large quantities of drugs they anticipated, they did locate the automatic weapon and 67.24 grams of marijuana—for which Simpson was placed under arrest.

At the Evidence Code section 402 hearing conducted before trial, Conzachi testified that, in his experience, narcotics and guns are part and parcel of the drug trade, and he recounted occasions upon which he had been drawn into gun battles while attempting to serve narcotics-related warrants. He explained he asked Simpson whether guns were in his residence solely to ensure the safety of his team and any others who might be present in or around the house when the warrant was served. He testified, "I realistically can't remember the last time . . . I encountered, during the service of a search warrant, . . . evidence of narcotic trafficking or narcotics that there was not a gun present." Based on this testimony, the court found the public safety exception to *Miranda* applied and admitted Simpson's statement that a .380-caliber automatic was located under his mattress in the master bedroom.

I

Simpson insists the trial court erred by allowing the prosecution to introduce his statement about the gun in its case-in-chief because the statement was not preceded by the warnings and waivers required by *Miranda*. We disagree.

Ordinarily, police officers are constrained to precede custodial interrogation by advising the person to be questioned of the right to remain silent, the consequences of failing to take advantage of that right, and the judicially created right to an attorney, which is financed by the public fisc should the person lack the ability to pay for the attorney's services. (*Miranda* v. *Arizona, supra*, 384 U.S. at p. 444 [86 S.Ct. at p. 1612].) These two rights—the right to remain silent and the right to an attorney—must be

waived knowingly and voluntarily[1] before questioning begins, and the individual queried must indicate an understanding that any statements made can be used to his or her detriment in court. (*Id.* at pp. 478-479 [86 S.Ct. at p. 1630]; accord, *People* v. *Whitson* (1998) 17 Cal.4th 229, 244 [70 Cal.Rptr.2d 321, 949 P.2d 18].) When police fail to administer the prophylactic warnings required by *Miranda*, any statements they obtain are inadmissible in the prosecution's case-in-chief (*id.* at pp. 492, 494 [86 S.Ct. at pp. 1637, 1638]), although the statements remain available to impeach the defendant who testifies inconsistently at trial. (*Harris* v. *New York* (1971) 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1]; *Oregon* v. *Hass* (1975) 420 U.S. 714 [95 S.Ct. 1215, 43 L.Ed.2d 570]; accord, *People* v. *Peevy* (1998) 17 Cal.4th 1184 [73 Cal.Rptr.2d 865, 953 P.2d 1212].)

The court that decided *Miranda* clearly intended its pronouncements be given sweeping effect, declaring that no statement obtained without a valid advisement and waiver could be used against a defendant or exploited for any purpose inconsistent with a defendant's interests during a criminal trial anywhere in the United States. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 444, 476 [86 S.Ct. at pp. 1612, 1629].) But times have changed dramatically since 1966. (See, e.g., Amar, *The Future of Constitutional Criminal Procedure* (1996) 33 Am. Crim. L.Rev. 1123; Whitebread, *The Burger Court's Counter-Revolution in Criminal Procedure* (1985) 24 Washburn L.J. 471-474.) As a result of the court's own repeated reexamination of the rule, it has become increasingly clear the scope of the *Miranda* rule, like most every other legal principle, has its limitations.

In *Harris* v. *New York, supra,* 401 U.S. 222, and *Oregon* v. *Hass, supra,* 420 U.S. 714, the United States Supreme Court weighed the benefits of its prophylactic rule against its desire to discourage defendants from personally proffering perjurious testimony, and in the end, *Miranda* gave way. (Cf. *United States* v. *Havens* (1980) 446 U.S. 620 [100 S.Ct. 1912, 64 L.Ed.2d 559]; and *Michigan* v. *Harvey* (1990) 494 U.S. 344 [110 S.Ct. 1176, 108 L.Ed.2d 293], where the court similarly deemed the Fourth Amendment and Sixth Amendment exclusionary rules less crucial than the need to discourage defendants from providing perjured testimony.) In *Michigan* v. *Tucker* (1974) 417 U.S. 433 [94 S.Ct. 2357, 41 L.Ed.2d 182], the court considered the scope of the rule and concluded a failure to properly administer *Miranda*

---

[1]While we also usually indicate waivers must be "intelligent," that term can be confusing; it conjures up the idea that the decision to waive *Miranda* rights must be *wise*. That, of course, is not the idea. (See *State* v. *McKnight* (1968) 52 N.J. 35 [243 A.2d 240, 250-251].) Essentially, "intelligent" connotes knowing and aware. (See *People* v. *Williams* (1998) 17 Cal.4th 148, 166 [69 Cal.Rptr.2d 917, 948 P.2d 429] (conc. and dis. opn. of Baxter, J.), quoting *Brady* v. *United States* (1970) 397 U.S. 742, 748 [90 S.Ct. 1463, 1469, 25 L.Ed.2d 747] [using the terms "knowing" and "intelligent" together to express a single idea].)

warnings did not justify the exclusion of derivative evidence discovered only because the police had exploited the defendant's unwarned statement.[2] And in 1984, in *New York* v. *Quarles, supra,* 467 U.S. 649, the high court refined the meaning of *Miranda* further by defining a situation in which the rule would have no application at all.

In *Quarles,* police officers were approached by a young woman who told them she had been raped by a man who subsequently entered a supermarket carrying a gun. (*New York* v. *Quarles, supra,* 467 U.S. at pp. 651-652 [104 S.Ct. at pp. 2628-2629].) When Quarles was finally apprehended, police found him wearing a shoulder holster, but the holster was empty and no gun was on his person. Without administering *Miranda* warnings, an officer asked what had become of the gun, and Quarles responded by nodding in the direction of some cartons, saying, " '[t]he gun is over there.' " (*Id.* at p. 652 [104 S.Ct. at p. 2629].)

---

[2]The message of *Tucker* was repeated in *Oregon* v. *Elstad* (1985) 470 U.S. 298, 305-309 [105 S.Ct. 1285, 1290-1293, 84 L.Ed.2d 222], in which the court emphasized that Fourth Amendment concepts—such as "taint" and "fruit of the poisonous tree"—have no place in the analysis of *Miranda* issues. (Cf. *New York* v. *Harris* (1990) 495 U.S. 14 [110 S.Ct. 1640, 109 L.Ed.2d 13].) While our Supreme Court approved a common law motion to suppress the fruit of *Miranda* violations in *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 733-734 [125 Cal.Rptr. 798, 542 P.2d 1390], it did so seven years before Proposition 8 was passed by the voters and without benefit of the analysis in *Elstad.* Moreover, in approving the suppression procedure, *Zolnay* relied on the reasoning of *People* v. *Superior Court* (1970) 3 Cal.App.3d 476 [83 Cal.Rptr. 771], disapproved in *People* v. *Turner* (1984) 37 Cal.3d 302, 318 [208 Cal.Rptr. 196, 690 P.2d 669], which was overruled by *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1115 [240 Cal.Rptr. 585, 742 P.2d 1306], and implicitly overruled in *People* v. *Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588]. In *People* v. *Superior Court,* the court opined, "[I]f . . . verbal statements which are the fruit of an illegal search and seizure are protected by the Fourth Amendment . . . we apprehend, conversely, that physical evidence which is the fruit of an illegal statement is also protected by the Fourth Amendment." (*People* v. *Superior Court, supra,* 3 Cal.App.3d at p. 484.) After *Tucker* and *Elstad,* it is manifest this statement is at odds with controlling federal constitutional principles. It is therefore not the law in California. (Cal. Const., art. I, § 28, subd. (d); *People* v. *May* (1988) 44 Cal.3d 309, 318 [243 Cal.Rptr. 369, 748 P.2d 307]; *In re Lance W.* (1985) 37 Cal.3d 873, 890, 896 [210 Cal.Rptr. 631, 694 P.2d 744]; *People* v. *Whitfield* (1996) 46 Cal.App.4th 947, 955-957 [54 Cal.Rptr.2d 370]; cf. *People* v. *Warner* (1988) 203 Cal.App.3d 1122, 1126 [250 Cal.Rptr. 462], review den. [intermediate appellate court concluded *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108] was abrogated by Proposition 8].) Although the California Supreme Court has not had occasion to rule on this issue since Proposition 8 was passed, the court has at least had the opportunity to recognize that, as a consequence of Proposition 8, its analysis in *Zolnay* must be reevaluated in light of federal law. (See *People* v. *Crittenden* (1994) 9 Cal.4th 83, 129-131 [36 Cal.Rptr.2d 474, 885 P.2d 887] [holding that, under *Davis* v. *United States* (1994) 512 U.S. 452, 454-455 [114 S.Ct. 2350, 2352-2353, 129 L.Ed.2d 362, 368], an *unequivocal* request for a lawyer is required before a suspect who has previously elected to speak with officers can argue that he or she invoked the *Miranda* right to counsel—contrary to prior California authority, including *Zolnay,* which had concluded certain equivocal statements were sufficient to invoke the *Miranda* right to counsel].)

 The court concluded "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." (*New York* v. *Quarles, supra,* 467 U.S. at p. 657 [104 S.Ct. at p. 2632].) In so holding, the court expressed its confidence that ". . . police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed *solely* to elicit testimonial evidence from a suspect." (*Id.* at pp. 658-659 [104 S.Ct. at p. 2633], italics added.) Thus, *Quarles* teaches that where questions are reasonably directed to defusing a situation which threatens the safety of either police officers or members of the general public,[3] a suspect's answers are admissible in evidence, even if the questions were not preceded by *Miranda* warnings, and even if they happened to elicit an incriminating response.

As the court in *People* v. *Gilliard* (1987) 189 Cal.App.3d 285 [234 Cal.Rptr. 401] insightfully observed, Quarles was "detained, frisked, and handcuffed prior to any questioning and was surrounded by at least four police officers when questioned about the gun. Nothing in the *Quarles* opinion suggests the police were then concerned for their own safety. Moreover, there was no imminent urgency; the supermarket was almost deserted and presumably could have been cordoned off. (*New York* v. *Quarles, supra,* 467 U.S. at p. 676 [104 S.Ct. at p. 2642] (dis. opn. of Marshall, J.).) Nor was there any lack of opportunity for the officers to provide *Miranda* warnings prior to any questioning. It was enough, however, that the officers reasonably believed the gun had been disposed of in a public place to justify an inquiry as to its location before *Miranda* warnings were required. As noted by the Supreme Court, had the suspect been provided *Miranda* warnings before such questions were asked, he might well have been deterred from responding, leaving a dangerous weapon at large in a public area." (*People* v. *Gilliard, supra,* 189 Cal.App.3d at p. 291.)

 So here, even though Simpson, who was handcuffed at a police command post, posed no imminent threat to anyone at the moment he was asked about guns in his residence, and even though there was no lack of opportunity to read him *Miranda* warnings, the public safety exception of *New York* v. *Quarles* still applies if the questions Conzachi asked were primarily related to an objectively reasonable need to protect police officers or the public from the dangers that would be immediately encountered once the police attempted to enter Simpson's residence to execute their warrant.

---

[3] It is settled that the public safety exception applies even when police questioning is designed solely to protect the lives of police officers and the lives of others are not at stake. (*People* v. *Cressy* (1996) 47 Cal.App.4th 981, 987-988 [55 Cal.Rptr.2d 237].)

(*New York* v. *Quarles, supra*, 467 U.S. at p. 659, fn. 8 [104 S.Ct. at p. 2633].) We find that they were. And the mere fact those questions *also* elicited an incriminating response does not remove them from the ambit of the *Quarles* exception.

Officer Conzachi, a veteran police officer who has participated in the service of innumerable narcotics-related search warrants, testified that the safety of police officers who are required to execute those warrants is always at serious risk. We are not surprised. Illegal drugs and guns are a lot like sharks and remoras. And just as a diver who spots a remora is well-advised to be on the lookout for sharks, an officer investigating cocaine and marijuana sales would be foolish not to worry about weapons. Particularly where large quantities of illegal drugs are involved, an officer can be certain of the risk that individuals in possession of those drugs, which can be worth hundreds of thousands and even millions of dollars, may choose to defend their livelihood with their lives—or, in this case, with the lives of 14 Rottweilers, the Luddite equivalent of a cache of AK-47's.

As the United States Supreme Court has made clear by limiting the application of its own rule, where human life is in peril, the purposes underlying *Miranda* pale by comparison to an officer's obligation to protect members of the public—and police—from harm. Thus, invoking the *Quarles* doctrine, our courts have permitted an officer to ensure his own safety by asking an in-custody suspect if he had needles or drug paraphernalia on his person prior to a search (*People* v. *Cressy, supra,* 47 Cal.App.4th 981) and validated an officer's inquiry about the location of a gun discarded by a suspect leaving the scene of a shooting (*People* v. *Gilliard, supra,* 189 Cal.App.3d 285). The *Quarles* "public safety" exception applies with equal force here, where officers had been commanded by way of a magistrate's warrant to enter into unknown quarters in which the use of deadly force was well within the realm of reasonable probability.[4]

Relying on *U.S.* v. *Mobley* (4th Cir. 1994) 40 F.3d 688, Simpson contends public safety concerns did not justify the inquiry about guns in his residence, since he had already been tricked into leaving his home, was being held some distance away in police custody, and had no access to his weapon. But *Mobley* is inapposite. There, by the time an FBI agent asked any questions of

---

[4]As Justice Rehnquist recalled in *Illinois* v. *Gates* (1983) 462 U.S. 213, 231 [103 S.Ct. 2317, 2328, 76 L.Ed.2d 527], quoting *Brinegar* v. *United States* (1949) 338 U.S. 160, 175 [69 S.Ct. 1302, 1311, 93 L.Ed. 1879], " 'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " Certainly these same practical considerations must be brought to bear here, where the very lives of police officers hang in the balance.

Mobley—who had been stark naked and alone when an agent entering his apartment pinned him behind his own front door—other agents had already performed a protective sweep of the place and assured themselves no one else was present. And it was a good bet Mobley's birthday suit concealed no weapons. Thus the court reasoned that when an agent asked whether Mobley had any weapons in his apartment, any danger such weapons might have posed had already been neutralized. Consequently, *Miranda* waivers should have been solicited before the question was asked. But that was not the situation here.

A neutral magistrate found probable cause to believe substantial quantities of illegal drugs were being secreted in Simpson's residence, and Conzachi's extensive experience in serving narcotics-related warrants led him to anticipate the presence of weapons that might be used to protect those drugs from seizure. Moreover, Conzachi had no way of knowing for sure who might still be "behind the door" at Simpson's home. The mere fact Simpson told the officer only a child and a nanny were inside was certainly not dispositive. Conzachi was not obliged to believe Simpson and unnecessarily subject himself and others to dangers he reasonably believed to exist.

The concerns we have discussed with regard to the service of narcotics-related search warrants are generally known, and they pose a clear and present danger to the safety of police officers, suspects, and other members of the general public. That's what *Quarles* was meant to protect against, and this is a proper case for its application.

II*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Sills, P. J., and Rylaarsdam, J., concurred.

On August 21, 1998, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 18, 1998.

---

*See footnote, *ante*, page 854.