Filed 12/9/15  P. v. Strider CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B258711 |
| Plaintiff and Respondent, | (Los Angeles County<br> Super. Ct. No. TA132732) |
| v. | |
| WALTER WILLIAM STRIDER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed in part; reversed in part.

Willoughby & Associates, Vanessa M. Ames and W. Anthony Willoughby for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Walter William Strider of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)),[1] and found true an allegation that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(A).)[2] He was sentenced to the low term of 16 months for possession of a firearm by a felon, plus two years consecutive for the gang enhancement.

In this appeal from the judgment, defendant contends (1) the trial court erroneously admitted his nonverbal admission of gang membership in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), (2) there is insufficient evidence to support the jury's finding as to the gang enhancement; and (3) an officer's in-court identification of defendant as the person in possession of the firearm was insufficient to prove a violation of section 29800, subdivision (a)(1), in light of the officer's more credible out-of-court identification of someone else as the man who possessed the firearm. We conclude that the introduction of defendant's nonverbal statement of gang membership violated *Miranda*. Because we reverse the gang enhancement on this ground, we do not consider defendant's contention that the evidence was otherwise insufficient to prove the gang enhancement. Finally, we find the evidence not only sufficient to support the conviction of possession of a firearm by a felon, but also sufficient to show that the *Miranda* violation was harmless beyond a reasonable doubt as to the conviction.

---

[1] All subsequent statutory references are to the Penal Code.

[2] Defendant was jointly tried with codefendant Jermaine Beard, who is not a party to this appeal. Beard was convicted of possession for sale of a controlled substance (Health & Saf. Code, § 11351) and possession for sale of cocaine base (Health & Saf. Code, § 11351.5), and the jury found a gang enhancement true as to both counts.

## BACKGROUND

*The Incident Leading to Defendant's Arrest*

On the evening of June 29, 2013, Los Angeles County Sheriffs' Department (LASD) Detective Steven Keen accompanied by Sergeant Brandon Dean, both members of the LASD's "Compton Operation Safe Streets" (OSS), and other officers, approached a residence at 1356 East Schinner Street in Compton to serve a search warrant. The house, commonly known as "the Studio," was within the territory of the South Side Compton Crips (SSCC), and used as its hangout.

The front door of the house was open, but a mesh security door was closed. As they looked inside the house through the security screen, Keen and Dean each saw defendant walking through the living room. He wore a white tank top and carried a purple towel, which Dean later discovered was wrapped around a .45-caliber Colt semiautomatic. Defendant dropped the towel (which landed with a loud thud) when he saw the officers, and ran toward the back door. Another man in the room, who wore a black tank top, also ran toward the back of the house. The officers forced open the door, entered and proceeded to clear the house. Dean and two other officers went through the house and, eventually, out the rear door, where both defendant and the man wearing the black shirt had been detained.

Meanwhile, Keen and another detective heard someone in the bathroom, and ordered that person to open the door. At that point Keen heard what sounded like a toilet being flushed. Beard emerged from the bathroom with water dripping down his forearms, and was taken into custody. Keen's search of the bathroom revealed a hidden compartment behind a mirror. He found wet baggies containing substances later identified as cocaine and cocaine base inside that compartment.

At trial, Dean opined, based in part on the quantity of cocaine and cocaine recovered, the presence of a weapon and his past experience of incidents involving

3

the house on Schinner Street, that the drugs found in the house were possessed for the purpose of sale.[3] He also testified that, in his experience, drug dealers commonly kept firearms in their residences or on their person to protect their narcotics. During the house search, Dean recovered a Colt .45 pistol with live rounds in the magazine and chamber, wrapped inside the purple towel defendant had dropped. The LASD also recovered a baseball cap with the Seattle Mariners' logo ("S"), a symbol commonly used by members of the SSCC.

*Detective Ibarra Questions Defendant and Testifies as a Gang Expert*

Several months later, on October 18, 2013, defendant was in a bedroom of a house at an unspecified location in SSCC territory when the LASD served a search warrant. Leland Lars, a member of the SSCC gang, and his toddler son were in another bedroom. Defendant, who pretended to be asleep, was roused by the LASD, handcuffed, searched and removed from the house to the back of a patrol car for about an hour. He was not free to leave and was not advised of his *Miranda* rights. While defendant was in the patrol car, Detective Raul Ibarra, a member of LASD's OSS, had a "discussion" with defendant during which he asked defendant "what's going on with you," and whether he was "still active in the hood." Defendant gave no verbal response to either question and neither affirmed nor denied being a gang member; his sole response was to shrug his shoulders. Ibarra perceived defendant's body language and shrug to be an admission on defendant's part that he remained an active gang member. Based on that assumption, Ibarra

---

[3]     The LASD also found a box of baggies and three digital scales in the kitchen.

4

created the first (and apparently only) Field Interview (FI) card identifying defendant as a member of the SSCC.[4]

At trial, Ibarra testified as the prosecution's gang expert. He testified that the SSCC has about 250 active members. Gang members wear hats with the Seattle Mariners' logo.

Ibarra opined that defendant was a member of the SSCC gang based on his communication with defendant, and information Ibarra obtained from informants who said defendant is a member of the SSCC and his moniker is "Little Maniac." Ibarra also testified that he had "personally contacted" defendant, had "talked to him before" and had "seen him out on the street," but did not specify how many such encounters or sightings occurred, or whether they had taken place after June 2013. Ibarra also testified that Beard (defendant's brother and codefendant), was a member of the SSCC whose moniker was "Maniac" or "Big Maniac."[5] Typically, a moniker using the term "Big" or "Little" refers to a gang member with a family connection.[6]

---

[4] FI cards are created based on an officer's belief that the subject of the card is a gang member; that person may not dispute information on the card.

[5] The jury was shown two YouTube videos posted in 2008 and recorded by Keen, in which Beard appears. In one video, entitled, "Maniac," Beard brags about his affiliation with the SSCC.

[6] Apart from the FI card created by Ibarra on October 18, no other evidence was offered regarding defendant's gang membership, and there was no evidence that he previously had been charged with any gang-related activity. Two people who had known defendant for years testified they were not aware—and did not believe—that defendant belonged to a gang, and had never heard him referred to as "Little Maniac."

5

The SSCC's primary activities are: vandalism, graffiti, robbery, carjacking, burglary, vehicle theft, possession and sale of narcotics, possession of illegal weapons, assault, murder and attempted murder. Ibarra has made drug arrests at the house on Schinner Street and has responded to shootings at that location. The SSCC's members possess weapons to defend themselves, other gang members and the gang's territory from rivals. Only an SSCC member may claim to belong to the gang. Anyone falsely claiming to be a member of the SSCC may be assaulted, shot or killed. Based on his contacts with informants within the SSCC, Beard's tattoos and information in the LASD's possession, Ibarra opined that Beard is an active member of the SSCC gang. SSCC gang members Trent Hawthorne and Jeremy Williams previously have been convicted of felonies (carjacking and possession of a handgun, respectively).

The prosecutor asked Ibarra to consider this hypothetical: a member of the SSCC gang is at an SSCC hangout at which narcotics are found after officers execute a search warrant. The gang member is in the living room holding an object which he drops upon sighting the officers, and flees. The object is later determined to be a .45-caliber semiautomatic firearm with a live round in the chamber. Ibarra opined that the gang member possessed the firearm for the benefit and in furtherance of the gang because he possessed the gun to protect himself, his fellow gang members, the narcotics and money made from drug sales.

Ibarra also was asked to consider another scenario: several members of the SSCC gang are inside a house located in SSCC territory when a search warrant is executed at the house. Cocaine and cocaine base are found behind a bathroom mirror, and digital scales and baggies are recovered. One gang member has a firearm. Based on these facts, Ibarra opined that possession of the narcotics was for the benefit of and in furtherance of the SSCC gang, which sells drugs to sustain

6

its lifestyle.  The gang member's possession of the handgun demonstrates that gang members need to protect themselves, the location at which they sell drugs, the drugs themselves and money made from drug sales.

Defendant did not present a defense.[7]

## DISCUSSION

1.    *Miranda* Violation

    a.    *Relevant Proceedings*

Before and during trial, defendant objected to admission of his non-verbal statement (the shrug of his shoulders), which Ibarra interpreted as an admission that he was an active member of the SSCC gang, as a violation of his *Miranda* rights, and Ibarra's use of that statement as a basis for creating an FI card.

Defendant's trial counsel argued that defendant was effectively under arrest on October 18—handcuffed, kept in a patrol car for up to an hour while the house was searched and not objectively free to leave—when he purportedly admitted to being a gang member.  The trial court disagreed that being handcuffed and placed in the back of a patrol car was tantamount to an arrest, but asked the prosecutor to conduct a voir dire examination of Ibarra.

On voir dire, Ibarra testified he had been involved in an investigation on October 18, 2013 involving defendant.  A warrant was issued (to enter a house at an unspecified address) with regard to defendant's possible possession of a handgun.  A man came to the door but ran away without opening the door when he realized the police were outside.  After forcing entry into the house, the officers

---

[7]    The parties stipulated that defendant had a prior felony conviction.

7

found Lars and his son in one bedroom and defendant in another, pretending to be asleep. He was roused, escorted from the house and searched. Then, placed in handcuffs for purposes of officer safety, defendant was required to remain in the back of a patrol car for the duration of the search. He was not free to leave, was not advised of his *Miranda* rights and remained in the car for about an hour. During that time, Ibarra made "small talk" with defendant and asked him, "What's going on with you?" and "Are you still active in the hood?" In response, defendant shrugged his shoulders. Ibarra interpreted that shrug as an affirmative response to the question whether he was still an active member of the gang and created an FI card.

The trial court found defendant had been kept in the patrol car for purposes of officer safety during the search. The court denied defendant's motion to exclude the statement after concluding the detention did not amount to an arrest and, as a result no *Miranda* warning was required.

b.  *Controlling Law and Standard of Review*

A statement obtained from a suspect as the result of a "custodial interrogation" is not admissible in the prosecution's case-in-chief, absent a knowing and intelligent waiver of the right to remain silent, the right to presence of an attorney and, in the case of an indigent suspect, the right to appointed counsel. (*People v. Sims* (1993) 5 Cal.4th 405, 440, overruled on another ground by *People v. Storm* (2002) 28 Cal.4th 1007, 1031-1032; *People v. Elizalde* (2015) 61 Cal.4th 523, 541 (*Elizalde*).) "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301 (*Innis*).) An interrogation is custodial when "a person has been taken into custody or otherwise deprived of his

8

freedom of action in any significant way." (*Miranda, supra*, 384 U.S. at p. 444.) An interrogation is not "limited to express questioning. Instead, the term refers to 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (*Elizalde, supra,* 61 Cal.4th at p. 531, quoting *Innis, supra,* 446 U.S. at p. 301, fn. omitted.)

For purposes of *Miranda*, an individual is deemed to be in custody if "'a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663.) The objective circumstances of the interrogation are examined, not the "'"subjective views harbored by either the interrogating officers or the person being questioned."' [Citation.]" (*People v. Kopatz* (2015) 61 Cal.4th 62, 80; *People v. Bejasa* (2012) 205 Cal.App.4th 26, 35 [test is whether a "'reasonable person in the suspect's position during the interrogation [would] experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest'"].) In making this determination, "[t]he totality of the circumstances surrounding an incident must be considered as a whole. [Citations.] Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the

suspect, and whether the suspect was arrested at the conclusion of the interview. [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403–1404 (*Pilster*).) *Miranda* advisements are required only if a person's freedom is sufficiently restricted to render him in custody. (*People v. Carpenter* (1997) 15 Cal.4th 312, 384, abrogated on another ground acknowledged in *People v. Diaz* (2015) 60 Cal.4th 1176, 1191.) Absent a custodial interrogation, *Miranda* does not apply. (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)

Our review of the trial court's determination that defendant was not subjected to custodial interrogation is a mixed question of law and fact. We apply a deferential substantial evidence standard to the court's factual findings regarding the circumstances surrounding the interrogation, but exercise our independent judgment to determine whether, given those circumstances, a reasonable person in defendant's position would have felt free to end the questioning and leave. (*People v. Moore* (2011) 51 Cal.4th 386, 403; *People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

    c.    *Analysis*

Two inquiries are required to determine whether defendant was subjected to a custodial interrogation or merely detained. First, what were the circumstances surrounding the interrogation? Second, would a reasonable person in those circumstances have felt he was free to terminate the interrogation and leave? (*People v. Ochoa* (1998) 19 Cal.4th 353, 401–402.)

In the present case, defendant was not formally arrested before Ibarra questioned him. Defendant was detained for about 60 minutes in the back of a patrol car. Ibarra appears to have been the only officer present during the questioning, but it is unclear how many other officers were nearby. Ibarra's trial

10

testimony reflects that he conducted the inquiry in a conversational manner, and there is no evidence he drew a weapon, behaved aggressively or pressured defendant in any manner. Nevertheless, defendant remained handcuffed the entire time.

Handcuffing a suspect during an investigative detention does not automatically convert it into a custodial interrogation for purposes of *Miranda*. (*Pilster, supra,* 138 Cal.App.4th at p. 1404; *United States v. Bautista* (9th Cir. 1982) 684 F.2d 1286, 1289–1290.) However, a *Miranda* warning is required once a detained suspect is placed under restraints normally associated with formal arrest. At that point, the suspect understands his detention is unlikely to be "temporary and brief" and that he is "completely at the mercy of the police." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 437–438.) Handcuffing is a traditional hallmark of formal arrest and readily conveys this message. (See e.g., *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 [placing restrictions on a person's freedom of movement may cause a reasonable person to believe he is not free to leave]; *United States v. Maguire* (1st Cir. 2004) 359 F.3d 71, 79 [handcuffs are "one of the most recognizable indicia of traditional arrest"].) Briefly handcuffing a detainee looks less like a formal arrest if the interrogating officer informs the suspect the cuffs are on temporarily and solely for safety purposes, and advises him that he is not under arrest and may decline to answer questions. (Cf., *United States v. Salvo* (6th Cir. 1998) 133 F.3d 943, 951 [fact that officer informed suspect he was free to leave and would not be arrested after interview was "an important factor in finding that the suspect was not in custody"].)

This record presents no similar mitigating facts. A reasonable person in defendant's position would conclude he was in custody when an officer handcuffed him immediately upon removing him from the house, and the officer kept him

uninformed, in cuffs and restrained to the back of a patrol car for an hour.  The prosecution presented no evidence to negate this assumption, i.e., no categorical statement from Ibarra that he told defendant he was not under arrest, could decline to answer questions or could leave.  Indeed, Ibarra testified defendant was indisputably not free to go.  Absent such assurances, a reasonable person would assume he was in police custody.  Nor was there any evidence defendant volunteered any information.  Under these circumstances, a reasonable person would have felt he was in custody at the time Ibarra asked questions of defendant as he sat cuffed in the back of the police vehicle.  Accordingly, we conclude defendant faced a custodial interrogation and the trial court erred in admitting his nonverbal statement in evidence.

2.	*No Exceptions Exempt Defendant's "Statement" from the Miranda Rule*

The Attorney General asserts that several exceptions to the requirement that a *Miranda* warning be provided apply here, including concern for officer safety, and exceptions for small talk, routine booking questions or on-the-scene investigations.  None of these contentions has merit.

a.	*No Public or Officer Safety Exception*

An exception to the *Miranda* rule applies in circumstances in which an officer's questions are reasonably prompted by concern for public safety if that concern outweighs the "need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." (*New York v. Quarles* (1984) 467 U.S. 649, 657 (*Quarles*).)  This exception has been applied in cases in which an officer is searching for a missing weapon to protect public safety (e.g., *People v. Simpson* (1998) 65 Cal.App.4th 854, 857 (*Simpson*)), and where an officer is

12

concerned for his own safety when searching a suspect (*United States v. Carrillo* (9th Cir. 1994) 16 F.3d 1046, 1049-1050; *Simpson, supra,* at p. 861). But the exception is narrow and applies only in situations involving an imminent threat to the public or an officer's safety. (*Quarles, supra,* 467 U.S. at pp. 657-658; *Elizalde, supra,* 61 Cal.4th at p. 540; *Simpson, supra,* 65 Cal.App.4th at p. 861 [to invoke exception in case of officer safety, officer's questions must focus on an objectively reasonable need to protect police from an imminent danger they might encounter in an ongoing situation].) In addition, the exception will be applied only if the officer's questions are both justified and narrowly tailored. (*People v. Cressy* (1996) 47 Cal.App.4th 981, 989.)

Based on Ibarra's bare assertion, the trial court found that defendant—thoroughly searched and handcuffed before being placed in the back of the patrol car—was detained for purposes of officer safety while officers searched the house. The Attorney General asserts that because defendant was "arrested . . . three-and-one-half months earlier for illegally possessing a firearm," the circumstances on October 18, 2013, created "'a perilous situation for the officers who were in close proximity to [him] . . . .' [and] . . . officers executing the search warrant were justified in attempting to locate firearms or other contraband inside the residence and secure their own safety before advising [defendant] of his *Miranda* rights." Not so.

The record reflects no cause to justify applying the officer safety exception to the *Miranda* rule here. In contrast with the cases from which the exception developed, there is no indication in the record that Ibarra—or any officer—had specific knowledge that defendant (who had pretended to be asleep when officers arrived) had used a weapon or that one was missing. Nor were Ibarra's queries to defendant narrowly aimed at protecting his or other officers' safety. Whatever

13

defendant's answers to the questions, Ibarra demonstrated no imminent need to obtain them to protect his own safety or to enable officers safely to search the house. On the contrary, Ibarra's vague and unrelated questions called for variable responses about what had been "going on with" defendant, and whether he was still active in the SSCC. Even assuming, as we must, that the trial court correctly interpreted a single shoulder "shrug" as an affirmative response solely to the latter of Ibarra's two questions, no imminent danger existed. The officer safety exception does not apply under these circumstances.

  b.  *No "Small Talk" Exception*

The Attorney General also argues in passing that no *Miranda* warning was required because Ibarra's questions were merely casual conversation or "small talk" unrelated to defendant's offense. Engaging in casual conversation with police officers is not considered a *Miranda* interrogation. (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 87, 89 [no interrogation occurred where defendant made incriminating statements while in custody of officers assigned to monitor him—due to his mental condition—who spoke to defendant about neutral topics].)

Ibarra's questions went beyond small talk. Indeed, it is difficult to characterize the exchange between defendant and Ibarra as "casual conversation" given that no actual conversation occurred. However, even if Ibarra's first question ("what's going on with you?") was merely a neutral, conversational inquiry, the second one (are you "still active in the hood") was neither neutral nor driven by idle curiosity about defendant's interests in life. The Attorney General's attempt to characterize Ibarra's questions as "small talk," rather than an attempt to elicit information in violation of *Miranda*, is belied by the prosecution's extensive

14

reliance on defendant's affirmative "response" as support for its assertion that defendant admitted being an active gang member.

c. *No Routine Booking Exception*

Routine booking questions are exempt from *Miranda's* coverage. (See *Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601-602; *Elizalde, supra,* 61 Cal.4th at p. 533.) Booking questions are aimed at eliciting biographical data such as a person's name, address, height, weight, eye color, age and date of birth. (*Pennsylvania v. Muniz, supra,* at pp. 601-602.) Such background or pedigree questions differ from questions regarding gang affiliation, which are reasonably likely to elicit an incriminating response. (*Id.* at pp. 600-601.) In the first place, there is no indication, and the trial court did not find, that Ibarra's questions to defendant—who was not arrested on October 18, 2013—were routine administrative inquiries.

More importantly, even if they were routine administrative inquiries, the California Supreme Court recently definitively rejected the view that questions about one's gang affiliation have legitimate administrative relevance, such as ensuring an inmate's security from rival gangs in jail (see e.g., *People v. Gomez* (2011) 192 Cal.App.4th 609, 634), and held that questions regarding gang affiliation exceed the scope of the booking exception. (See *Elizalde, supra*, 61 Cal.4th at pp. 527, 538 & fn. 9, disapproving analysis in *Gomez.*)

In California, questions about gang affiliation often carry penal consequences and are reasonably likely to elicit an incriminating response. California has enacted a comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs. (See § 186.20, et seq.; *Elizalde, supra*, 61 Cal.4th at pp. 538-539.) The statutes punish active participation in a

15

criminal street gang by one who knows """"its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang.""" (*Elizalde, supra*, 61 Cal.4th at pp. 538-539.) They also impose potentially substantial additional punishment for felonies committed "'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'" (*Id*. at p. 539.) For this reason questions regarding one's gang affiliation do not fall within *Miranda's* narrow "booking question" exception for identifying basic biographical data. (*Id*. at p. 538.) Rather, such questions must be measured under the general objective test "which defines as 'interrogation' questions the police should know are 'reasonably likely to elicit an incriminating response.' [Citation.]" (*Ibid*.) Where, as here, the police know or should know that a gang-affiliation inquiry is reasonably likely to elicit an incriminating response potentially exposing a suspect to prosecution for the crime of gang participation and enhanced punishment, the suspect's unadmonished answer to that inquiry is inadmissible at trial. (*Id*. at p. 540.)[8]

---

[8] This rule applies whether the officer asked the question for a non-investigatory purpose or as a pretext to elicit incriminating information. "'[A]pplications of the *Miranda* rule generally do not turn upon the individual officer's subjective state of mind . . . .' [Citation.]" (*Elizalde, supra*, 61 Cal.4th at p. 536.) The intent of a questioning officer is relevant to the extent it demonstrates what he or she should have known about the nature of the questions, but it is not necessary; the test is objective. (*Id*. at p. 537.) A "'practice that the police *should know* is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation.' [Citation.]" (*Id*. at p. 537, italics added.)

d.      *No General On-The-Scene Investigation Exemption*

General on the scene questioning by police such as occurs when someone is temporarily detained by an officer asking general questions to determine whether he or she has probable cause to arrest does not require a *Miranda* warning. (*People v. Milham* (1984) 159 Cal.App.3d 487, 500 [defendant's statement that he believed he had killed his wife made to officer called to investigate a car accident did not require *Mirandizing* because the officer, unaware of a potential crime, was not trying to trick the defendant into revealing criminal actions, and only briefly questioned the defendant in an effort to obtain an explanation of facts surrounding the accident] (*Milham*).)

Here, Ibarra was not conducting an on-the-scene investigation. He had no interest in facts explaining events that had led to issuance of a search warrant to investigate defendant's unlawful possession of a handgun, or the whereabouts of any weapon. Ibarra sought only and specifically information to confirm defendant's status as a gang member, information he had previously been able to obtain only from potentially untrustworthy informants. Thus, despite the brevity of his interrogation, Ibarra clearly sought to compel incriminating information from defendant by circumventing *Miranda*. Such conduct cannot be condoned. (*Milham, supra*, 159 Cal.App.3d at p. 500.)

In sum, on this record, defendant was subjected to custodial interrogation in violation of *Miranda*. Accordingly, the trial court erred in permitting the prosecution to use defendant's nonverbal "statement" against him during its case-in-chief.

3.  *The Error Was Not Harmless Beyond a Reasonable Doubt as to the Gang Allegation*

Statements obtained in violation of *Miranda* are subject to harmless error review.  (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310 (*Fulminante*); *People v. Davis* (2009) 46 Cal.4th 539, 588.)  "The erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18.  [Citations.]  That test requires the [Attorney General] here 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'  [Citation.]"  (*Elizalde, supra*, 61 Cal.4th at p. 542.)

Here, the Attorney General maintains the trial court's erroneous admission of defendant's statement—which was tantamount to a confession that he was an active member of the SSCC gang—was harmless as to the gang allegation because: (1) defendant did not make a statement, but simply shrugged his shoulders; and (2) the jury was instructed to "[c]onsider with caution any statement made by a defendant tending to show his guilt unless the statement was written or otherwise recorded."  Neither of these assertions has merit.

The Attorney General's first assertion contradicts the premise of its own arguments and the prosecution's trial strategy.  At trial, the prosecutor relied extensively on defendant's nonverbal "statement" as definitive evidence that defendant admitted he was an active gang member.  An admission is the most damaging evidence a prosecutor can use against a defendant.  (*Chapman, supra*, 386 U.S. at p. 23.)  We conduct our prejudice review bearing in mind the United States Supreme Court's admonition that a "confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . .  [T]he admissions of a

18

defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury . . . .' [Citations.]" (*Fulminante, supra*, 499 U.S. at p. 296.) The California Supreme Court has similarly recognized that "confessions, 'as a class,' '[a]lmost invariably' will provide persuasive evidence of a defendant's guilt [citation], and . . . often operate 'as a kind of evidentiary bombshell which shatters the defense' [citation] . . . ." (*People v. Cahill* (1993) 5 Cal.4th 478, 503.) Consequently, "the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard." (*Ibid.*; accord, *People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884.)

The prosecution relied extensively on Ibarra's interpretation of defendant's "statement" to prove the gang-related allegations. Further, Ibarra relied almost exclusively on that nonverbal statement to create defendant's first (and only) FI card stating he belonged to the SSCC gang, evidence the prosecution employed to great effect to prove the gang allegation. Ibarra's expert opinion that defendant was a member of the SSCC also was predicated primarily on his interpretation of the shrug as an admission that he was active in the SSCC. In the absence of defendant's "statement," the only evidence to indicate gang membership was the fact that he was twice detained while in the company of one or more SSCC gang members in SSCC territory, and Ibarra's testimony that informants told him at some unspecified time about defendant's membership in the gang. No other affirmative evidence of gang membership was offered. There is no evidence that defendant has conspicuous (or any) gang tattoos, no evidence he has ever been

19

convicted of a gang-related crime, and no evidence that any officer who testified had personal knowledge of defendant's gang status.

We also reject the assertion that a jury instruction sufficiently mitigated any prejudice concerning the gang allegation. True, the jury was told to exercise caution in considering any statement defendant made that tended to show guilt unless it was "written or otherwise recorded." However, Ibarra unequivocally interpreted the shrug as an admission of gang membership, and created a written FI card so stating. Under these circumstances, the jury instruction to exercise caution in considering such evidence was not adequate to show, beyond a reasonable doubt, that introduction of the evidence did not contribute to the jury's finding of the gang enhancement. Thus, the gang enhancement must be reversed.[9]

However, we disagree with defendant that the error requires reversal of the conviction of possession of a firearm by a felon. As we explain, below, we reject defendant's contention that substantial evidence does not support the conviction, and further conclude that such evidence demonstrates that introduction of defendant's nonverbal admission of gang membership was harmless beyond a reasonable doubt as to the conviction.

4.    *Substantial Evidence Supports the Conviction for Possession of a Firearm*

Defendant contends that the evidence is insufficient to support his conviction of possession of a firearm by a felon, because Dean's in-court

---

[9]     Because we reverse the gang enhancement on this ground, we do not discuss defendant's contention that the evidence was otherwise insufficient to support the gang enhancement.

identification of him as the person who possessed the firearm was contradicted by Dean's prior identification of someone else. We disagree.

The jury heard audio recordings made by Dean of events that transpired before and after the search warrant was executed on June 29, 2013, and officers entered the house on Schinner Street. At trial, Dean testified that he saw two people inside before he entered the house: defendant, who was wearing a white tank top, and another man in a black tank top. In one recording, Dean identified the man who dropped the purple towel as "the person in the black shirt." At trial, Dean testified that defendant had been in possession of the purple towel and firearm as the officers approached. Dean had seen defendant at least 100 times and knew him by name. He explained that he had mistakenly identified the person in the black shirt in the audio recording as the one who dropped the towel, but he knew it was defendant; Keen had corrected him. When he got outside the house on Schinner, Dean recognized that it had been defendant who held and dropped the towel.

Keen testified at trial that the only person he saw in the living room as he looked through the security screen was the man who held and then dropped the purple towel. He identified defendant as that person. Keen did not see anyone in a black shirt before entering the house.

On this record, the evidence was clearly sufficient to prove that defendant was the person who held the purple towel that concealed the firearm. (*People v. Maury* (2003) 30 Cal.4th 342, 403, disapproved on another ground by *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 896 [reviewing court does not resolve credibility issues or evidentiary conflicts].)

More than that, however, this evidence shows that the error in introducing defendant's nonverbal admission of gang membership was harmless beyond a

reasonable doubt as to defendant's conviction. The evidence of defendant's nonverbal admission was used to prove the gang enhancement; it did not prove possession of a firearm. That charge was independently supported by Dean and Keen's testimony. At trial, Dean explained his mistake in the recording, and stated that he knew at the time that defendant had held the purple towel. He was very familiar with defendant, having seen defendant at least 100 times, and knew him by name. Keen confirmed that defendant was the person who held the towel. Thus, there was little room for doubt that defendant possessed the towel, and the firearm concealed in it. Under these circumstances, not only was the evidence sufficient to support defendant's conviction; it was compelling enough to render the *Miranda* violation harmless beyond a reasonable doubt.

## DISPOSITION

The gang enhancement under section 186.22, subdivision (b)(1)(A) is reversed, and the matter remanded for a decision whether to retry the gang allegation, and (regardless of that decision) for resentencing. The judgment is otherwise affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:



EPSTEIN, P. J.                    MANELLA, J.

22